**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Lerner & Rowe PC, | No. CV-21-01540-PHX-DGC |
| Plaintiff, | **ORDER** |
| v. | |
| Brown Engstrand & Shely LLC, et al., | |
| Defendants. | |

Plaintiff Lerner & Rowe, PC brought this action against Defendants Joseph Brown and Brown Engstrand & Shely LLC, which do business as The Accident Law Group, claiming trademark infringement, unfair competition, false designation of origin, false description, and unjust enrichment. Doc. 1. The parties cross-move for summary judgment on the trademark infringement and unjust enrichment claims. Docs. 56, 65. Defendants also move for summary judgment on all claims against Joseph Brown. Doc. 65.

The motions are fully briefed and the Court heard oral argument on April 4, 2023. *See* Docs. 57, 66-70. For reasons stated below, Defendants' motion will be granted in part and denied in part and Plaintiff's motion will be denied.

**I.      Background.**

Plaintiff Lerner & Rowe is an Arizona-based law firm that specializes in personal injury litigation. Doc. 57 ¶¶ 2-3. Plaintiff also operates Lerner & Rowe Law Group,

another law firm specializing in other areas of the law, and Lerner & Rowe Gives Back Foundation, a nonprofit organization dedicated to community outreach.  *Id.* ¶¶ 4-7.  Plaintiff and its principals own three federally registered trademarks: "Lerner & Rowe," "Glen Lerner," and "Lerner & Rowe Gives Back LR."  *Id.* ¶ 10.  Plaintiff advertises by Internet, radio, television, and print media throughout Arizona and the United States, spending more than one million dollars per month.  *Id.* ¶¶ 12-14.

Defendant The Accident Law Group ("ALG") is a personal injury law firm that operates primarily in the Phoenix area.  Doc. 57 ¶ 16; Doc. 66-1 at 3.  Defendant Joseph Brown founded ALG, manages the firm, and directs its advertising activity.  Doc. 57 ¶¶ 17-19; Doc. 66 ¶¶ 1, 74.  ALG competes with Plaintiff and employs a similar advertising strategy.  Doc. 57 ¶¶ 20-21; Doc. 66 ¶¶ 1, 75.

From December 2015 to May 2021, Defendants purchased specific keywords from Google as part of their marketing strategy.  Doc. 57 ¶ 23; Doc. 66, ¶¶ 23, 82.  When an Internet user entered search terms that included keywords Defendants had purchased, Google would return normal search results, but would also include ALG's advertisements in the results.  Doc. 57 ¶ 22; Doc. 66 ¶ 1.  This case arises because Defendants purchased "Lerner & Rowe" as Google keywords.  Doc. 57 ¶ 23; Doc. 66 ¶¶ 23, 82.  As a result, for several years, consumers searching for "Lerner & Rowe" on Google would receive returns that included ALG's advertisement.  Doc. 57 ¶ 25; Doc. 66 ¶¶ 25, 81.  Plaintiff claims that this advertising tactic infringed its trademark.

## II.    Legal Standards.

A party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Summary judgment is also appropriate against a party who "fails to

make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. Only disputes over facts that might affect the outcome of the suit will preclude the entry of summary judgment. The disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

To prevail on a trademark infringement claim, a plaintiff must prove (1) that it has a protectible ownership interest in the mark, and (2) that the defendant's use of the mark is likely to cause consumer confusion, thereby infringing the plaintiff's rights to the mark. *Dep't of Parks & Recreation for State of Cal. v. Bazaar Del Mundo Inc.*, 448 F.3d 1118, 1124 (9th Cir. 2006). The parties in this case agree that "Lerner & Rowe" is a valid, protectible trademark that belongs to Plaintiff. Doc. 57 ¶ 10; Doc. 66 ¶¶ 1,10. They also agree that Defendants purchased "Lerner & Rowe" as a keyword from Google for several years. Doc. 57 ¶ 22; Doc. 66 ¶ 1. Each side moves for summary judgment on the second element of Plaintiff's trademark claim – whether Defendants' actions caused a likelihood of confusion. *See* Docs. 56, 65.

Although it might at first seem that one firm's purchase of another firm's trademark as a Google keyword would constitute infringement, courts generally have not adopted that view. In *Network Automation, Inc. v. Advanced Systems Concepts, Inc.*, 638 F.3d 1137 (9th Cir. 2011), the Ninth Circuit reversed a preliminary injunction that enjoined one competitor from purchasing another competitor's trademark as a Google keyword. And as a leading trademark treatise notes: "Courts almost always find no likelihood of confusion if all that defendant has done is use another's mark as a keyword to trigger an ad for defendant in which the other's trademark does not appear." J. Thomas McCarthy, 5 McCarthy on Trademarks and Unfair Competition § 25A:7 (5th ed.) (citing cases).

Plaintiff advances theories of source confusion and initial interest confusion. Source confusion exists "when consumers are likely to assume that a product or service is associated with a source other than its actual source because of similarities between the

two . . . marks or marketing techniques." *Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 825 (9th Cir. 1993) (cleaned up). Initial interest confusion "occurs when the defendant uses the plaintiff's trademark in a manner calculated to capture initial consumer attention, even though no actual sale is finally completed as a result of the confusion." *Network Automation*, 638 F.3d at 1144 (quoting *Nissan Motor Co. v. Nissan Computer Corp.*, 378 F.3d 1002, 1018 (9th Cir. 2004)). To establish initial interest confusion, the trademark owner "must demonstrate likely confusion, not mere diversion." *Id.* at 1149.

### III.   Factors Relevant to Likelihood of Confusion.

The Ninth Circuit has identified eight factors for assessing likelihood of confusion: (1) strength of the mark, (2) relatedness of the goods or services, (3) similarity of the marks, (4) evidence of actual confusion, (5) marketing channels used, (6) types of goods or services and degree of care exercised by consumers, (7) defendant's intent in selecting the mark, and (8) likelihood of expansion of the product lines. *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979). These "*Sleekcraft* factors" are "pliant," with "the relative importance of each individual factor being case-specific." *Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*, 174 F.3d 1036, 1054 (9th Cir. 1999); *see also Sleekcraft*, 599 F.2d at 348 (citations omitted) ("The list is not exhaustive. Other variables may come into play depending on the particular facts presented."); *Stone Creek, Inc. v. Omnia Italian Design, Inc.*, 875 F.3d 426, 431 (9th Cir. 2017) (citations omitted) ("[C]ourts do not merely count beans or tally points. Not all factors are created equal, and their relative weight varies based on the context of a particular case.").

This is particularly true for Internet advertising. As the Ninth Circuit has explained, "[g]iven the multifaceted nature of the Internet and the ever-expanding ways in which we all use the technology . . . it makes no sense to prioritize the same . . . factors for every type of potential online commercial activity." *Network Automation*, 638 F.3d at 1148; *Playboy Enters., Inc. v. Netscape Commc'ns Corp.*, 354 F.3d 1020, 1023 (9th Cir. 2004) (considering all eight *Sleekcraft* factors); *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1205 (9th Cir. 2000) (focusing on "(1) the similarity of the marks, (2) the relatedness

4

of the goods or services, and (3) the simultaneous use of the Web as a marketing channel.") (citations omitted); *Brookfield*, 174 F.3d at 1062 ("[T]he traditional eight-factor test is not well-suited for analyzing the metatags issue.").

Unlike in the traditional infringement context, there is a risk that a consumer using a trademark as a search term "might be confused by a results page that shows a competitor's [paid] advertisement on the same screen, when that advertisement does not clearly identify the source or its product." *Network Automation*, 638 F.3d at 1149. In that context, the four most important factors are: "(1) the strength of the mark; (2) the evidence of actual confusion; (3) the type of goods and degree of care likely to be exercised by the purchaser; and (4) the labeling and appearance of the advertisements and the surrounding context on the screen displaying the results page." *Id.* at 1154.

This case involves direct competitors offering personal injury legal services. Doc. 57 ¶ 20; Doc. 66 ¶ 1. The gravamen of Plaintiff's complaint is that Defendants purchased Plaintiff's mark to "misleadingly direct" prospective clients from Lerner & Rowe to ALG. Doc. 56 at 2. This case presents issues like those raised in *Network Automation*. 638 F.3d at 1154. The Court therefore will focus its analysis on the four factors emphasized in *Network Automation* and will address the remaining *Sleekcraft* factors only briefly.[1]

### A.    Strength of the Mark.

The parties do not dispute that Plaintiff's trademark is strong. Doc. 57 ¶ 15; Doc. 66 ¶ 1. "Lerner & Rowe" is a federally registered trademark, and federal registration "alone may be sufficient in an appropriate case to satisfy the determination of distinctiveness." *Network Automation*, 638 F.3d at 1149.

---

[1] Defendants contend that "[i]n the keyword-advertising context, the Ninth Circuit has found most of the *Sleekcraft* factors unhelpful" and urge the Court to apply *Multi Time Machine, Inc. v. Amazon.com, Inc.*, 804 F.3d 930 (9th Cir. 2015). Doc. 65 at 7-12. But the Court finds *Network Automation* more relevant, as have other courts considering keyword advertising cases between competitors. *See, e.g.*, *Asuragen, Inc. v. Accuragen, Inc.*, No. 16-CV-05440-RS, 2018 WL 558888, at *3 (N.D. Cal. Jan. 25, 2018) (declining to apply *Multi Time* in a trademark dispute between a medical technology company and a molecular diagnostic company).

1    In addition, the commercial strength of a mark relates to "actual marketplace

2 recognition." *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618

3 F.3d 1025, 1034 (9th Cir. 2010).  Evidence of "extensive advertising, length of exclusive

4 use, and uniqueness" may strengthen a mark.  *Accuride Int'l, Inc. v. Accuride Corp.*, 871

5 F.2d 1531, 1536 (9th Cir. 1989).  Plaintiff has used the "Lerner & Rowe" trademark since

6 at least 2006 and has spent over $100 million in advertising.  Doc. 57-3 at 1; Doc. 57-2 at

7 29-30.  Plaintiff has been counsel to over 100,000 clients.  Doc. 57-1 at 1.  This all

8 strengthens Plaintiff's mark.[2]

9    "The purpose of examining the strength of plaintiff's mark is to determine the scope

10 of trademark protection to which the mark is entitled." *Entrepreneur Media, Inc. v. Smith*,

11 279 F.3d 1135, 1141 (9th Cir. 2002) (citations omitted).  The stronger Plaintiff's mark, the

12 greater protection it will receive.  *See id.*

13    Because Plaintiff's mark is strong, "consumers searching for [Lerner & Rowe] are

14 presumably looking for its specific [services], and not a category of [services]." *Network*

15 *Automation*, 638 F.3d at 1150.[3]  Consumers "therefore could [have been] more susceptible

16

17

---

18    [2] The Court finds the mark strong even though some case law, focusing on
conceptual strength, suggests a different conclusion.  "Conceptual strength involves

19 classification of a mark 'along a spectrum of generally increasing inherent distinctiveness
as generic, descriptive, suggestive, arbitrary, or fanciful.'" *Network Automation*, 638 F.3d

20 at 1149 (citation omitted).  Because the "Lerner & Rowe" mark identifies the founding
partners of the law firm, some cases would suggest it is only descriptive and thus

21 "inherently [conceptually] weak." *Am. Int'l Grp., Inc. v. Am. Int'l Bank*, 926 F.2d 829,
832 (9th Cir. 1991); *see Quiksilver, Inc. v. Kymsta Corp.*, 466 F.3d 749, 760 (9th Cir. 2006)

22 ("Personal names . . . are generally regarded as descriptive terms, which are not inherently
distinctive.") (cleaned up).  The Court finds that the mark's federal registration, substantial

23 advertising history, and frequent use in Internet searches amply demonstrate its strength,
as the parties seem to agree.

24

25    [3] Defendants dispute this presumption, arguing that consumers do not have
"homogenous goals and expectations," and "[w]here an online shopper's search objective

26 is unclear, it is impossible to determine whether that shopper was actually confused or
misled."  Doc. 65 at 9-10.  But the presumption concerns what consumers are "looking

27 for," not what they expect to find in a typical Internet search.  This distinction is recognized
in the article Defendants cite.  *See* David J. Franklyn, David A. Hyman, *Trademarks As*

28 *Search Engine Keywords: Much Ado About Something?* 26 Harv. J.L. & Tech. 481, 517-
18 (2013) (reporting that 99% of survey participants were looking for some combination
of products bearing the brand name they searched for and competing brands).

to confusion when sponsored links appear[ed] that advertise[d]" Defendants' similar personal injury litigation services. *Id.* at 1149.

## B. Evidence of Actual Confusion.

Evidence of actual confusion "is persuasive proof that future confusion is likely." *Sleekcraft*, 599 F.2d at 352 (cleaned up). "But proving actual confusion is difficult . . . and the courts have often discounted such evidence because it was unclear or insubstantial." *Id.* And what might initially appear to be evidence of actual confusion may instead be evidence of consumer error. 4 McCarthy on Trademarks & Unfair Competition § 23:13.

Plaintiff argues that its evidence shows actual confusion. *See* Doc. 56 at 3-4. Defendants maintained call logs for four years which show that callers to Defendants' phone number mentioned Lerner & Rowe 236 times. *See* Docs. 57-10, 57-11. Each log entry includes the date of the call and the caller's name, as well as a column labeled "[w]hat they said referred by." Doc. 57-11 at 1. Plaintiff contends that many of the responses in this column show actual confusion, including: "Referred by L&R (they had a conflict)"; "referred by L&R"; "googled – L&R"; "Internet – Lerner & Rowe"; "thought he called L&R"; "Lerner/Rowe/TV"; and "Wanted L&R." *Id.*

## 1. Defendants' Hearsay Arguments.

Defendants assert that these call log entries are inadmissible hearsay. Doc. 65 at 17. Defendants argue that the call logs themselves are out-of-court declarations admitted for the truth of the matter asserted, constituting a first level of hearsay. This objection is likely to be overcome at trial by testimony satisfying the business records exception. Fed. R. Evid. 803(6). There appears to be no doubt that the logs were made and retained by Defendants in the regular course of their business, by employees receiving the incoming calls and recording contemporaneous statements. And deposition testimony shows that the call logs were created by Defendants as a regular practice. *See* Doc. 57-4 at 48-49.

Defendants further argue that statements in the "[w]hat they said referred by" column constitute separate out-of-court declarations by callers, admitted for the truth of the matter asserted (why the caller called), constituting a second level of hearsay. This is a

closer question, but the Court concludes that these statements would also likely be admissible at trial.

Under Rule 807, a statement is admissible if "(1) the statement is supported by sufficient guarantees of trustworthiness – after considering the totality of the circumstances under which it was made and evidence, if any, corroborating the statement, and (2) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts." Fed. R. Evid. 807(a). Both elements are satisfied here.

First, the circumstances under which the caller's statements were recorded appear to be reliable. Defendants made the records. They presumably employed capable employees and reasonable business practices. Defendants maintained the logs for a serious business purpose – to assess the effectiveness of their marketing strategy and make appropriate adjustments. *See* Doc. 57-4 at 36. These facts suggest that the callers' stated reasons for calling were recorded accurately and with care.

Second, statements made by callers are the most probative evidence on a central issue in this case – whether consumers were actually confused by Defendants' use of Plaintiff's name as a keyword. *See F.T.C. v. AMG Servs., Inc.*, No. 2:12-CV-00536-GMN, 2014 WL 317781, at *15-16 (D. Nev. Jan. 28, 2014) (admitting statements contained in a consumer-complaint database and statements from the defendants' former employees regarding those complaints under Rule 807(a)); *see also* 5 Weinstein's Federal Evidence § 803.08 (2021) ("[A] statement included in a record of a regularly conducted activity may demonstrate trustworthiness and be admissible under the residual hearsay exception . . . . A judge, therefore, has some discretion to admit the statements of non-participants in the regular activity if the facts indicate that the statements are sufficiently reliable.").[4]

---

[4] Plaintiff argues that the statements can be admitted under Rule 801(d)(2)(B) as admissions of the party opponent. This may be a viable argument. Weinstein's states that "[a] party may adopt a written statement if the party *uses the statement* or takes action in compliance with the statement." 5 Weinstein's Federal Evidence § 801.31 (2021) (emphasis added). It appears Defendants used the callers' statements in crafting its marketing strategy. The Court has found other cases that may support admission of the logs in their entirety. *See United States v. Ullrich*, 580 F.2d 765, 771-772 (5th Cir. 1978)

1

## 2.    Ambiguity of the Call Logs.

Plaintiff describes the calls in three categories.  The first category includes instances where callers were either "looking for" or "calling for" Plaintiff, "wanted Plaintiff," or "stated explicitly that they thought Defendants were Plaintiff."  Doc. 56 at 3-4.  The second category of callers stated that a Google or Internet search prompted their call.  *Id.* at 4.  The third category includes callers who "mentioned Plaintiff by name . . . but no additional context was recorded."  *Id.*  Defendants raise a fourth category: callers who said they were referred by Plaintiff.  Doc. 65 at 19 (citing Doc. 57-2 and Doc. 57-10).  Plaintiff says there were five such callers.  Doc. 57 ¶ 37.  Defendants put the number at 29.  Doc. 57-10 at 3.

Plaintiff argues that the first category – those in some way requesting Lerner & Rowe – reflect "customers express[ing] confusion as to whether Defendants [were] . . . affiliated with Plaintiff."  Doc. 56 at 11.  But without more information, it is difficult to know exactly what the callers were experiencing.  Defendants say they identified themselves as "Accident Law Group" in each of the calls.  Doc. 57 at 42-43.  The first category of responses therefore might suggest that the callers understood the difference between Lerner & Rowe and the Accident Law Group and were not confused about whether they were the same; or might suggest that the callers phoned Defendants by mistake; or might suggest the callers called because they thought Defendants' Google ad was for Lerner & Rowe.  *See Cohn v. PetSmart, Inc.*, 281 F.3d 837, 843 (9th Cir. 2002) ("Cohn received several dozen inquir[i]es over the years about whether the parties were related.  Without some other evidence of actual confusion, however, these inquiries are too ambiguous to demonstrate actual confusion.").

(inventory schedule prepared by credit company was admissible because witness testified that this schedule is integrated into records used and kept in the regular course of business); *United States v. Pfeiffer*, 539 F.2d 668, 670-71 (8th Cir. 1976) (invoices from common carriers were prepared and transmitted in regular course of business, manufacturer relied on them, and custodian was familiar with invoicing procedures); *but see N.L.R.B. v. First Termite Control Co.*, 646 F.2d 424, 429 (9th Cir. 1981) (addressing these two cases and stating that the Ninth Circuit will not decide whether they are correctly decided).  Finally, many courts have admitted reports of statements by allegedly confused customers under Rule 803(3).  *See* 4 McCarthy on Trademarks and Unfair Competition § 23:15 n.4 (citing cases).

For the second category of calls, Defendants' employees recorded phrases such as "googled-L&R" and "website/looking for L&R." *See, e.g.*, Doc. 57-11 at 1, 4. Again, because Defendants identified themselves upon receiving the call and later asked what prompted the call, it is difficult to know if these callers were confused by Defendants' ads. That might be the case, or it might be that the callers became interested in Defendants' ad after starting a Google search for Lerner & Rowe. *Cf. Jim S. Adler, P.C. v. McNeil Consultants, L.L.C.*, 10 F.4th 422, 429 (5th Cir. 2021) (considering that a personal injury law firm did not identify itself on a call prompted by a keyword search of a competitor's mark as evidence of initial interest confusion).

As to the third and fourth categories, some entries state "Lerner and Rowe" or "TV-L&R." *See, e.g.*, Doc. 57-11 at 2. Others state "referred by L&R" or "referred by Lerner & Rowe." *See, e.g.*, *id.* at 1-2. Plaintiff contends that the "Lerner & Rowe" entries are evidence of actual confusion (Doc. 56 at 2; Doc. 67 at 6), but Plaintiff's contention ignores that Plaintiff really did refer some clients to Defendants (Doc. 57-2 at 7). Further, that a caller said Plaintiff's television advertisement prompted them to call does not show that Defendants' Google advertisement caused confusion.

In short, although Defendants' call logs certainly are relevant evidence on the question of consumer confusion, they are not definitive. More information is needed to determine which if any of the callers were in fact confused by Defendants' use of the keywords and Internet ads.

### 3. Plaintiff's Actual Confusion Evidence is *De Minimis*.

Even if all 236 calls are considered evidence of actual confusion, the Court finds it *de minimis*. "The federal statute prohibiting trademark infringement requires a trademark holder to prove that the alleged infringer's use of a mark 'is likely to cause confusion, or to cause mistake, or to deceive.'" *Thane Int'l, Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 900 (9th Cir. 2002) (quoting 15 U.S.C. § 1114(1)(a) & (b)). The ultimate question to be answered in this case, therefore, is whether Defendants' use of Plaintiff's name as a keyword created a "likelihood" of confusion.

10

Evidence of actual confusion can be used to prove a likelihood of confusion.  As the Ninth Circuit has explained, evidence of actual confusion "constitutes 'persuasive proof that future confusion is likely.'"  *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1265 (9th Cir. 2001) (quoting *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 845 (9th Cir. 1987)).  "If enough people have been actually confused, then a likelihood that people are confused is established."  *Thane*, 305 F.3d at 902.

As the Ninth Circuit has further explained, however:

> This is not to say that evidence of actual confusion will always compel a jury to find likelihood of confusion.  In some cases, a jury may properly find actual confusion evidence de minimis and thus unpersuasive as to the ultimate issue.  But if a party produces evidence from which a reasonable jury could surmise that an "appreciable number" of people are confused about the source of the product, then it is entitled to a trial on the likelihood of confusion – although it will not necessarily prevail at that trial.

*Id.* (cleaned up) (quoting *Entrepreneur Media*, 279 F.3d at 1150-51).

As this statement makes clear, isolated instances of actual confusion are not enough. The evidence must be sufficient to show actual confusion among an "appreciable number" of potential consumers.  *Id.*  In other cases, the Ninth Circuit has said there must be actual confusion "among significant numbers of consumers."  *Network Automation*, 638 F.3d at 1151; *see also Rearden LLC v. Rearden Com., Inc.*, 683 F.3d 1190, 1210 (9th Cir. 2012) ("evidence of actual confusion, at least on the part of an appreciable portion of the actual consuming public, constitutes strong support for a 'likelihood of confusion' finding"); *Playboy*, 354 F.3d at 1026 ("significant numbers of consumers"); *Nutri/System, Inc. v. Con-Stan Indus., Inc.*, 809 F.2d 601, 606 (9th Cir. 1987) ("[T]he instances of confusion, at best, were thin, and at worst, were trivial. . . . The court acted properly in finding that any actual confusion was de minimis.").

The Ninth Circuit has never defined what it means by an "appreciable" or "significant" number of confused consumers.  But because infringement plaintiffs ultimately must prove a "likelihood" of confusion, it seems evident that the number of confused consumers must be compared to the total number of consumers who were

exposed to the allegedly misleading actions of the infringer.  A number that might seem "appreciable" or "significant" standing alone may be only minimal when compared to the universe of persons who saw the allegedly infringing advertisement.  As the McCarthy treatise notes:

> Evidence of the number of instances of actual confusion must be placed against the background of the number of opportunities for confusion before one can make an informed decision as to the weight to be given the evidence. If there is a very large volume of contacts or transactions which could give rise to confusion and there is only a handful of instances of actual confusion, the evidence of actual confusion may receive relatively little weight.

4 McCarthy on Trademarks and Unfair Competition § 23:14.

The parties agree that during the years that Defendants purchased Plaintiff's name as a keyword, Google searches for some version of "Lerner & Rowe" returned a screen that included Defendants' advertisement 109,322 times.  Doc. 66, ¶ 91; Doc. 68 at 1.  The 236 instances of potential confusion constitute 0.215% of this total number.  Thus, even if it is assumed that all 236 callers who mentioned Lerner & Rowe were confused by Defendants' use of keywords (contrary to the ambiguity of the calls as noted above), Plaintiff's evidence shows that only two-tenths of one percent of the consumers who searched for Plaintiff's law firm and saw Defendants' ads were actually confused by those ads.  This tiny percentage cannot reasonably be said to constitute an "appreciable" or "significant" number of consumers confused by Defendants' advertising strategy.  Nor can it be said to show that Defendants' marketing strategy made confusion likely.  15 U.S.C. § 1114(1).[5]

Defendants present a consumer survey showing a net confusion rate of 3%. Doc. 66-7 at 12-13.  Plaintiff contends that the survey "is flawed in several crucial respects,

---

[5] It is also undisputed that of the 109,322 Google searches that returned a page with Defendants' ad, the consumer conducting the search clicked on Defendants' ad 7,452 times.  Doc. 66, ¶ 92; Doc. 68 at 1.  This "click through" rate is 6.82%.  But Plaintiff present no evidence about how many of these consumers ever contacted Defendants, much less were misled by Defendants' ads (as opposed to recognizing the ad was for a different law firm and returning to their original search).

and the Court should give little, if any, weight to the findings therein." Doc. 67 at 17. But the Court cannot weigh evidence at the summary judgment stage, and Plaintiff does not argue that the survey is inadmissible. If believed by a jury, the survey would further support Defendants' contention that any confusion in this case is minimal.

Plaintiff does not produce a competing consumer survey. "This warrants a presumption that the results would have been unfavorable." *Playboy Enters., Inc. v. Netscape Commc'ns Corp.*, 55 F. Supp. 2d 1070, 1084 (C.D. Cal.), *aff'd*, 202 F.3d 278 (9th Cir. 1999); *see, e.g.*, *Stonefire Grill, Inc. v. FGF Brands, Inc.*, 987 F. Supp. 2d 1023, 1053-54 (C.D. Cal. 2013); *James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.*, No. SACV 11-1309-DOC ANX, 2013 WL 655314, at *9 (C.D. Cal. Feb. 21, 2013). And even if the Court does not adopt such a presumption, the absence of a contrary survey means that Plaintiff's sole evidence of actual confusion consists of 236 call log entries – approximately 0.2% of the total confusion opportunities.

## C.     Type of Goods & Degree of Care.

Confusion is less likely where buyers exercise care and precision in their purchases, such as when they are shopping for expensive or sophisticated items. *Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*, 457 F.3d 1062, 1076 (9th Cir. 2006). "Consumers are expected to proceed with more care if the goods or services are specialized or of uncommon importance." *Great Am. Duck Races Inc. v. Kangaroo Mfg. Inc.*, 398 F. Supp. 3d 494, 506 (D. Ariz. 2019).

Selecting a lawyer is likely quite important to persons seeking to recover damages for personal injuries, even if they are not normally sophisticated consumers of legal services. And consumers purchasing expensive goods or services "can be expected to exercise greater care." *Network Automation*, 638 F.3d at 1152; *see also E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1293 (9th Cir. 1992) (citations omitted). "Legal services are expensive, generally costing hundreds if not thousands of dollars." *ACI L. Grp. PLLC v. ACI L. Grp. PC*, No. CV-21-00098-PHX-DWL, 2021 WL 4263692, at *16 (D. Ariz. Sept. 20, 2021). Consumers seeking legal representation are thus likely to

exercise more care.  *Id.*; *see also Cochran Firm, P.C v. Cochran Firm Los Angeles, LLP*, No. CV-12-05868-SJO-MRWX, 2013 WL 12114839, at *10 (C.D. Cal. Feb. 26, 2013), *rev'd on other grounds*, 572 F. App'x 491 (9th Cir. 2014) (concluding that prospective clients of law firms offering personal injury legal services "are likely to exercise a greater degree of care than consumers of basic consumer goods.").

Plaintiff argues that legal services provided on a contingency basis are not expensive, reducing the level of care consumers will exercise.  Doc. 56 at 12-13.  The Court does not agree.  Paying one-third or more of an accident recovery in the form of a contingent fee is very expensive relative to the benefit received, and can be expensive in absolute terms for higher dollar claims.

What is more, consumers generally are becoming savvier in Internet searches and less likely to be deceived when they see competing ads.  As the Ninth Circuit has noted, "the default degree of consumer care is becoming more heightened as the novelty of the Internet evaporates and online commerce becomes commonplace."  *Network Automation*, 638 F.3d at 1152; *see also Toyota Motor Sales v. Tabari*, 610 F.3d 1171, 1178 (9th Cir. 2010) ("Consumers who use the internet for shopping are generally quite sophisticated about such matters.").

In view of the product at issue in this case – important and expensive legal services – and the growing sophistication of Internet shoppers generally, the Court finds that consumers searching on Google for Lerner& Rowe are likely to exercise significant care, reducing the chances of confusion.

**D.      Appearance of the Advertisement and the Surrounding Context.**

"In the keyword advertising context, the likelihood of confusion will ultimately turn on what the consumer saw on the screen and reasonably believed, given the context." *Network Automation.*, 638 F.3d at 1153 (cleaned up).  "[C]lear labeling can eliminate the likelihood of initial interest confusion in cases involving Internet search terms."  *Multi Time*, 804 F.3d at 937; *see also Playboy,* 354 F.3d at 1035 (Berzon, J., concurring) ("There is a big difference between hijacking a customer to another website by making the customer

think he or she is visiting the trademark holder's website (even if only briefly), which is what may . . . happen[] . . . when . . . advertisements are not labeled, and just distracting a potential customer with another choice, when it is clear that it is a choice."); *Aliign Activation Wear, LLC v. lululemon athletica Canada Inc.*, No. 2:20-CV-03339-SVW-JEM, 2021 WL 3117239, at *14 (C.D. Cal. June 7, 2021), *aff'd*, No. 21-55775, 2022 WL 3210698 (9th Cir. Aug. 9, 2022) (granting summary judgment against the plaintiff because the search results were clearly labeled); *Boost Beauty, LLC v. Woo Signatures, LLC*, No. 2:18-CV-02960-CAS-EX, 2022 WL 409957, at *12 (C.D. Cal. Feb. 7, 2022) ("[T]he WooLash advertisement that appeared after the 'boostlash' search is labeled as an advertisement, and features a product clearly labeled as WooLash, with no reference to plaintiff's BoostLash product.  Accordingly, it is highly unlikely that a consumer searching for the BoostLash product would confuse it for the WooLash product.").

The leading trademark treatise offers this analogy:

[A] customer walk[s] into a brick and mortar retail computer store and ask[s] the salesperson to show him a DELL laptop.  Assume hypothetically, that competitor LENOVO offers the retailer a higher margin of profit than DELL. So the salesperson guides the customer over to a counter with LENOVO computers, saying: "DELL laptops are great, but have you looked at the new LENOVO?"

In this hypothetical LENOVO has "bought" the DELL mark and other competing brands in the sense that the salesperson is motivated to mention LENOVO as an alternative.  The customer is diverted or distracted, but certainly not "confused" or "deceived."

5 McCarthy on Trademarks and Unfair Competition § 25A:8.

In the keyword advertising context, a search engine displaces the computer store in this analogy.  *See id.* at n.9 (citing Eric Goldman, *Brand Spillovers*, 22 Harv. J.L. & Tech. 381, 398-400 (2009) ("[J]ust as retailers sit between manufacturers and consumers in the distribution chain, online intermediaries now effectively sit between consumers and retailers in that chain.")).  The results page of the search engine – like the computer salesperson – informs the consumer of alternatives.  *Id.* ("From a consumer perspective,

the brand-triggered ads are analogous to a retail salesperson informing the consumer that competitive choices exist.").  And suggesting alternatives increases advertising revenues for the search engine like the increased profit margins the computer store generates.

But if advertisements do not "clearly identify [their] source" or are "unlabeled," they are "more likely to mislead consumers into believing" that by clicking on the ad they will be directed to the trademark holder's website.  *Network Automation*, 638 F.3d at 1147, 1154; *see, e.g.*, *Porta-Fab Corp. v. Allied Modular Bldg. Sys., Inc.*, No. 8:20-CV-01778, 2022 WL 4596646, at *3 (C.D. Cal. July 24, 2022) (finding an advertisement not clearly labeled when "a competitor . . . did not just incorporate a competitor's trademarked name as a search term, but rather used a phrase in its Google Ad that essentially told consumers it sold [the plaintiff's] products," and used the plaintiff's name in the advertisement); *Gravity Defyer Corp. v. Under Armour, Inc.*, No. LA CV13-01842 JAK, 2014 WL 3766724, at *9 (C.D. Cal. July 7, 2014) (finding an advertisement not clearly labeled when "[n]early all of Defendants' advertisements are labeled as 'Under Armour Micro G Defy'" and "Plaintiff's advertisements are labeled as 'G Defy' or 'Gravity Defyer.'").

The record contains screenshots of Google pages produced by searching for "lerner & rowe," "lerner rowe," and similar searches.  Doc. 57-6.  Plaintiff produces 28 such screenshots.  Doc. 57-6.  A declaration attached to Plaintiff's reply brief states, however, that only three of them were captured before or during May 2021, when Defendants were buying Plaintiff's trademark as a keyword.  Doc. 68-3 (listing screenshots which can be found at Doc. 57-6 at 1, 3, and 4).  Defendants' counsel agreed with this fact during oral argument.  The remaining screenshots were taken after May 2021, when Defendants were not buying Plaintiff's name as a keyword, and Plaintiff's counsel acknowledged during oral argument that there is no evidence in the record suggesting that Defendants' purchase of Lerner & Rowe as a keyword during or before May 2021 would have resulted in an increase in their advertisement being displayed after that date.  Thus, to evaluate the effect of Defendants' allegedly infringing conduct – buying the keywords – the Court will

consider only the three screenshots taken while Defendants were making such purchases before or during May 2021.  *See* Doc. 57-6 at 1, 3-4.

In all three screenshots, Defendants' advertisements are labeled with the word "Ad" in bold typeface at the top left corner of the entry – the first thing a reader sees in the entry. *See id.*  Defendants' ad includes their name and phone number, links to Defendants' website, and the following generic language: "Accidents Happen – Understand Your Options," or "Call now to speak with an experienced accident attorney," or "We've Represented Over 4000 Satisfied Clients – Get A Free Consultation Now[.]"  *Id.* Defendants' ads do not use Plaintiff's trademarked name "Lerner & Rowe" or any other form of "Lerner" or "Rowe" in their ads.  *Id.*  Nor do they use Plaintiff's common language of "Hurt in a wreck?" or otherwise seek to mimic Plaintiff's trademark or ads.  *Id.*

In one of the three relevant screenshots, Defendants' ad appears first, labeled "Ad" in bold type, followed immediately by a larger entry for Plaintiff's firm, not labeled "Ad." *See* Doc. 57-6 at 3.  Plaintiff's larger entry contains the name "Lerner & Rowe" with sub links for "Attorneys," "Contact," "Lerner & Rowe Staff," "Phoenix," and other cities.  *Id.* Defendants' smaller ad does not use or otherwise seek to mimic Plaintiff's trademark.  *Id*.

The second relevant screenshot shows Plaintiff's ad, not Defendants', as the first search result.  *See id.* at 4.  Defendants' ad appears next, clearly labeled "Ad" in bold type and using Defendants' ALG name.  *Id.*  Defendants' ad does not use the words "Lerner" or "Rowe" or otherwise mimic Plaintiff's trademark.  *Id.*

The third screenshot contains only Defendants' ad, clearly labeled "Ad" in bold type, and using Defendants' firm name.  *Id.* at 1.  No other part of the search result is shown, but the page is clearly cut off so the rest of the search results cannot be seen.  *Id.* The fact that there were more results is clearly shown by Google's language at the top of the screenshot: "About 1,450,000 results (0.57 seconds)."  *Id.*  Plaintiff's counsel agreed during oral argument that some of the screenshots were cropped and did not show all the search results.  Defendants' ad in this third screenshot does not contain the words "Lerner" or "Rowe" or any other imitation of Plaintiff's trademark.  *Id.*

17

Remember the Ninth Circuit's guidance that "[i]n the keyword advertising context, the likelihood of confusion will ultimately turn on what the consumer saw on the screen and reasonably believed, given the context." *Network Automation.*, 638 F.3d at 1153 (cleaned up).  This case is a good example.  A consumer looking at the three relevant screenshots would see Defendants' entry with Defendants' name, clearly labeled "Ad," would see Plaintiff's competing entry with their name and trademark, and would see nothing in Defendants' ad to suggest that Defendants are Lerner & Rowe.  "[C]lear labeling can eliminate the likelihood of initial interest confusion in cases involving Internet search terms." *Multi Time*, 804 F.3d at 937.  Given the likelihood that consumers conducting these searches were relatively sophisticated Internet users with a strong incentive to choose a good law firm to vindicate their personal injury rights, the likelihood of confusion is very low.

Plaintiff argues that Defendants' "generic" and "chameleon-like" name – Accident Law Group – "more easily confuses a searcher into believing they are affiliated with another firm, especially a firm like Plaintiff that has a related entity with a similar name that predates Defendants' firm by several years: Lerner & Rowe Law Group."  Doc. 56 at 10.  But "Accident Law Group" is not confusingly similar to "Lerner & Rowe" and Plaintiff presents no evidence that any consumers ever searched for the full name "Lerner & Rowe Law Group" or even knew that "Law Group" was part of Plaintiff's family of names.

### E.    Trademark Infringement Conclusion.

Three of the four key factors discussed above favor Defendants, but "[t]he list of factors is not a score-card – whether a party 'wins' a majority of the factors is not the point." *Thane*, 305 F.3d at 901.  The point is that the Court should use the relevant factors to decide, in the case of a summary judgment motion, whether the plaintiff has presented enough evidence for a reasonable jury to find a likelihood of confusion.  The Ninth Circuit has "cautioned that district courts should grant summary judgment motions regarding the likelihood of confusion sparingly, as careful assessment of the pertinent factors that go into determining likelihood of confusion usually requires a full record." *Id.* at 901-02.  It is also

the case, however, that summary judgment is appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

This is one of the rare cases where summary judgment is warranted on the issue of likelihood of confusion. "[T]he *sine qua non* of trademark infringement is consumer confusion," and "when we examine initial interest confusion, the owner of the mark must demonstrate likely confusion, not mere diversion." *Network Automation*, 638 F.3d at 1149.

The three relevant screenshots produced by Plaintiff show clear labeling of Defendants' entry, using Defendants' name and prominently labelled as an "Ad," and with no use of Plaintiff's trademark or confusingly similar language or content.  Reasonably savvy Internet users with a strong incentive to select the right lawyer would not be confused by these clearly labeled ads into believing that Defendants were Plaintiff.  Plaintiff produces no survey evidence showing a likelihood of confusion, and its evidence that, at most, 0.215% of all consumers exposed to Defendants' ads were in fact confused by them is simply not enough to show a likelihood.  Two-tenths of one percent is not an appreciable or significant portion of consumers exposed to Defendants' keyword-generated ads.  Plaintiff does have a strong mark, but no reasonable jury viewing Plaintiff's thin evidence could find that potential clients viewing Defendants' clearly labeled ads are likely to be confused into thinking Defendants were in fact Plaintiff.

The 25 irrelevant screenshots produced by Plaintiff – screenshots taken during a time when Defendants' were *not* buying Plaintiff's name as a keyword – reinforce the Court's conclusion.  Each of the irrelevant screenshots was produced by searching for "lerner & rowe," "lerner rowe," or a variation of these words.  Doc. 68-3.  And even though Defendants had not purchased Plaintiff's name as a keyword, Defendants' ads appeared in the search results along with ads for other personal injury law firms.  Google's algorithm apparently called up similar law firms when a specific law firm was searched for.  *See, e.g.,* Doc. 57-6 at 15 (including an ad for azinjuredworker.com), 17 (getlawyersnow.com and palumbowolfe.com),  18  (arjashahlaw.com),  20  (getlawyersnow.com),  22  (hutzler

law.com), 28 (larryhparkerphoenix.com).  These screenshots show what Internet users find when searching on Google for Lerner & Rowe – ads for a variety of law firms.  As with all searches on Google, the consumer then must scroll through the returns to decide which entries are worth clicking on.  Because Defendants' entries use their name and are clearly labeled "Ad," the consumers would know they are seeing an ad for another law firm, as would be true with the other firms seen in the screenshots.  The Internet user would then, as the Ninth Circuit has recognized, "skip from site to site, ready to hit the back button whenever they're not satisfied with a site's contents."  *Toyota Motor Sales*, 610 F.3d at 1179.  This is not confusion; this is typical Internet searching.  And because "the owner of the mark must demonstrate likely confusion, not mere diversion," Plaintiff has presented insufficient evidence to survive summary judgment.  *Network Automation*, 638 F.3d at 1149.

### F.    Other Factors.

The less relevant *Sleekcraft* factors do not alter this conclusion.

- The parties are direct competitors and offer essentially the same services, but the Google search returns would simply present them with options to consider.  Savvy Internet users searching for a professional to represent them would be capable of considering the alternatives with care.  *Network Automation*, 638 F.3d at 1150 ("The proximity of the goods [may] become less important if advertisements are clearly labeled or consumers exercise a high degree of care, because rather than being misled, the consumer would merely be confronted with choices among similar products.").

- On similarity of the marks, the foregoing discussion shows that Defendants' ads are not similar in "appearance" or "sound" to Plaintiff's marks.  *Fortune Dynamic*, 618 F.3d at 1032.

- Both parties advertise in the same marketing channels, including the Internet.  Doc. 57, ¶ 21; Doc. 66, ¶ 1.  But the "shared use of a ubiquitous marketing channel does not shed much light on the likelihood of consumer confusion."  *Network Automation*, 638 F.3d at 1151 (citation omitted); *see also Playboy*, 354 F.3d at 1028 (The plaintiff's and the

advertisers' "sites appear[] on search results pages.  Given the broad use of the Internet today, the same could be said for countless companies.  Thus, this factor merits little weight.").

- On Defendants' intent, Plaintiff points to the same evidence it uses in support of actual confusion.  This evidence does not show that Defendants' "use of [Plaintiff's] trademark serve[d] to mislead consumers rather than truthfully inform them of their choice" in personal injury attorneys.  *Network Automation*, 638 F.3d at 1153; *see also Sazerac Co., Inc. v. Fetzer Vineyards, Inc.*, 265 F. Supp. 3d 1013, 1036 (N.D. Cal. 2017), *aff'd*, 786 F. App'x 662 (9th Cir. 2019) (An "intent to compete . . . is not . . . equivalent to an intent . . . to mislead and to cause consumer confusion.").

- Likelihood of expansion of product lines is not helpful because the parties are already direct competitors.  *Brookfield*, 174 F.3d at 1060 ("The likelihood of expansion in product lines factor is relatively unimportant where two companies already compete to a significant extent.").

In sum, the Court reaches the same conclusion whether it considers the four factors emphasized in *Network Automation* or all the *Sleekcraft* factors.

## IV.    Unjust Enrichment.

Plaintiff seeks damages under A.R.S. § 44-403, arguing that Defendants "wrongfully divert[ed] the relevant consuming public to Defendants' website and phone number."  Doc. 56 at 16.  Plaintiff's citations to pre-*Network Automation* cases are not helpful.  As discussed above, "mere diversion" does not support a trademark infringement claim.  *Network Automation*, 638 F.3d at 1149.  Because Plaintiff has failed to present sufficient evidence of consumer confusion, it also fails to present sufficient evidence of "wrongful diversion."  *ACI L. Grp. PLLC*, 2021 WL 4263692, at *18 (citing *Maier Brewing Co. v. Fleischmann Distilling Corp.*, 390 F.2d 117, 121 (9th Cir. 1968) (noting the rationale behind applying unjust enrichment to trademark infringement claims is "that the infringer has taken the plaintiff's property as represented by his trade-mark and has utilized this property in making a profit, and that if permitted to retain the profit, the

infringer would be unjustly enriched.").  The Court will grant summary judgment for Defendants on unjust enrichment.

**V.     Defendant Joseph Brown's Liability.**

Defendants move for summary judgment on Defendant Brown's liability as to Plaintiff's remaining unfair competition claims.  *See* Doc. 65 at 2.

"A corporate officer or director is, in general, personally liable for all torts which he authorizes or directs or in which he participates, notwithstanding that he acted as an agent of the corporation and not on his own behalf." *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1021 (9th Cir. 1985) (citations omitted) (finding a corporate officer personally liable in the "passing off" context); *see also Comm. for Idaho's High Desert, Inc. v. Yost*, 92 F.3d 814, 823 (9th Cir. 1996) (applying *Transgo* to trademark infringement).  Cases imposing personal liability on "corporate officers have typically involved instances where the defendant was the 'guiding spirit' behind the wrongful conduct or the 'central figure' in the challenged corporate activity." *Davis v. Metro Prods., Inc.*, 885 F.2d 515, 524 (9th Cir. 1989) (citing *Escude Cruz v. Ortho Pharm. Corp.*, 619 F.2d 902, 907 (1st Cir. 1980)) (cleaned up); *see, e.g.*, *Bell v. Moawad Grp., LLC*, 326 F. Supp. 3d 918, 931 (D. Ariz. 2018) ("There is no genuine dispute that Mr. Moawad was 'a moving, active conscious force behind' the infringement. Mr. Moawad conducted the online image search, found the infringing image, thought of a caption for it, and sent it to an employee with express directions to post the image on MCG's three social media accounts.") (citations omitted).

Defendants assert that "Lerner & Rowe has no evidence of wrongful conduct by Mr. Brown individually."  Doc. 65 at 25.  Defendants offer no support for this contention. "Even after *Celotex* it is never enough simply to state that the non-moving party cannot meet its burden at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1105 (9th Cir. 2000) (citing *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991)); *see Century Int'l Arms Inc. v. XTech Tactical LLC*, No. CV-18-03404-PHX-GMS, 2020 WL 6526205, at *2 (D. Ariz. Nov. 5, 2020).

What is more, deposition testimony shows that Defendant Brown created his own advertising agency to personally direct ALG's marketing efforts and directed the keyword advertising campaign for eighteen months of the relevant period.  Doc. 57-4 at 14-15.  The Court will deny summary judgment as to Defendant Brown's liability on the remaining claims.

**IT IS ORDERED:**

1. Plaintiff's motion for summary judgment (Doc. 56) is **denied.**

2. Defendants' motion for summary judgment (Doc. 65) is **granted in part** and **denied in part** as set forth in this order.

3. By separate order, the Court will schedule a conference call to set a trial date and schedule a final pretrial conference.

Dated this 18th day of May, 2023.

David G. Campbell
Senior United States District Judge